DANG VANG; Yia Moua; Yang Xiong; Maichao Vang, Plaintiffs/Appellees,

v.

VANG XIONG X. TOYED, individually and in his capacity as Refugee Counselor, Defendant/Appellant.

No. 90–35254.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 10, 1991.

Decided Sept. 5, 1991.

---

Nancy L. Talner, Seattle, Wash., and Carl Maxey, Maxey Law Offices, Spokane, Wash., for defendant/appellant.

Barry E. Ryan, J. Steve Jolley, Spokane, Wash., for plaintiffs/appellees.

Before WRIGHT, BRUNETTI and LEAVY, Circuit Judges.

BRUNETTI, Circuit Judge:

Vang Xiong Toyed ("Xiong") appeals from a judgment entered after a jury verdict against him in a suit pursuant to 42 U.S.C. § 1983 (§ 1983). Plaintiffs, along with their spouses, brought this action against Xiong, a Washington State employee, asserting he raped them during the course of his employment. Appellant argues that the verdict is faulty because there was no evidence he was acting under "color of state law." He also argues the trial court erroneously admitted the testimony of three expert witnesses and that such testimony was prejudicial. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. Facts and Proceedings

The parties in this case are Hmong refugees from Laos. Appellee Yia Moua ("Moua") moved with her family to Spokane, Washington in 1979. In 1981 she sought employment and was referred to Xiong who was employed by the Washington State Employment Security office. Xiong was responsible for interviewing and finding refugees suitable employment. Moua apparently filed an application and was interviewed by Xiong, but was unsuccessful in obtaining a job.

In 1983 Moua contacted Xiong to assist her in learning to drive and in passing the Washington driver's license test. Moua alleged that sometime between January and March 1983 Xiong picked her up and told her he was going to take her some place where she could study for the driver's exam. The two drove to a motel where, Moua charges, Xiong raped her.

In 1983 appellee Maichao Vang ("Vang") moved with her family to the Spokane area from a refugee camp in Thailand. Vang testified she eventually contacted Xiong to assist her in obtaining employment and that at various times Xiong drove her to sewing clubs to apply for work. On one occasion Xiong insisted that she accompany him to Idaho to deliver a letter to a Hmong family. Instead, Xiong drove Vang to a motel where he raped her twice.

Later, Xiong contacted Vang regarding a possible job. After she joined him for the interview, he raped her. Vang testified that Xiong raped her at least sixteen times and on each occasion he relied on the pretext of a potential employment opportunity. On one occasion Xiong raped Vang when he was supposed to be helping her obtain her driver's license.

Eventually each plaintiff revealed the rape to her husband and the couples filed a complaint under § 1983 against Xiong, his supervisors, and his employer, the Washington State Department of Employment Security. The district court granted defendants' motions for summary judgment in part, which resulted in the dismissal of all defendants except Xiong. The trial resulted in a verdict in favor of the plaintiffs for $300,000.

## II.

Appellant asserts there was insufficient evidence to support a jury conclusion that Xiong acted "under color of state law." Xiong's counsel moved for directed verdict after plaintiffs' case, but failed to raise the matter again at the close of the evidence. For that reason, he was precluded from asserting a motion JNOV at the

end of the trial. "Because [Xiong] is precluded from challenging the sufficiency of the evidence, [this court's] 'inquiry is limited to whether there was *any evidence* to support the jury's verdict [on the color of law issue], irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in a manifest miscarriage of justice.'" *Herrington v. County of Sonoma*, 834 F.2d 1488, 1500 (9th Cir.1987), *modified on other grounds*, 857 F.2d 567 (1988), *cert. denied*, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989) (citations omitted) (emphasis supplied).

█ To assert a claim under § 1983, a plaintiff must demonstrate that she was deprived of a constitutional right by a person acting under color of law. *Collins v. Womancare*, 878 F.2d 1145, 1147 (9th Cir. 1989), *cert. denied*, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990). Plaintiffs' constitutional rights were deprived here. The challenge to the verdict is there is no evidence Xiong acted *under color of state law.*

A person acts under color of state law, if he "exercise[s] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). The Court said "[i]t is firmly established that a defendant in a § 1983 suit acts under color of state law *when he abuses the position given to him by the state.* Thus generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West*, 487 U.S. at 49–50, 108 S.Ct. at 2255–2256 (emphasis added).

There is no assertion here that Xiong was not a public employee. At all times relevant to this case he was employed by the Washington State Department of Employment Security. There was also evidence Xiong was an officer of the Refugee Ethnic Community of Spokane, Inc. (RECOS), an organization that provides assistance to refugees and is funded by state and federal agencies. Plaintiffs' theory at trial was that Xiong came into contact with Moua and Vang because of his state employment and at least in the case of Vang, that she was raped while Xiong was assisting her in securing employment. With regard to Moua, the assertion was that she was raped when Xiong was acting in his capacity as an official of RECOS. Xiong claimed to be taking her to study for the driver's license exam and preparation for that exam is part of the assistance offered by RECOS. Appellees argue the organization is sufficiently connected to the state to warrant a finding that Xiong acted under color of law.

█ We need not decide whether RECOS is a state entity because it is clear Xiong came into contact with the plaintiffs and used his position in the state government to deprive these women of their constitutional right to be free from sexual assault. The Supreme Court said in *Lugar v. Edmondson Oil Co. Inc.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) that "'misuse of power, possessed by virtue of state law and possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of state law."'" 457 U.S. at 929, 102 S.Ct. at 2750 (quoting *Classic*, 313 U.S. at 326, 61 S.Ct. at 1043). The Court also has required that the acts of state employees be under "pretense" of some state law. *Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495 (1945). The pretense is lacking if the wrongful act is "not in any way related to the performance of the duties of the state employee." *Murphy v. Chicago Transit Authority*, 638 F.Supp. 464, 467 (N.D.Ill.1986) (citing *Johnson v. Hackett*, 284 F.Supp. 933, 937 (E.D.Pa.1968)).

In *Murphy*, an attorney employed by the Chicago Transit authority sued fellow employees under § 1983 for sexual harassment at her workplace. The issue raised was whether the co-workers acted under color of law. 638 F.Supp. at 467. The court stated

Defendants ... engaged in their abusive and offensive conduct while at their

place of employment. The *defendants were capable of harassing plaintiff only because their jobs enabled them to have frequent encounters with her.* Therefore, it may be said that defendants' contacts with plaintiff were made possible only because defendants were given certain state authority [i.e., their jobs] and that in the course of exercising their authority, the defendants abused plaintiff....

This conclusion, however, does not mean that defendants' actions were pursued under color of state law.... [A]ctions taken under color of state law must be related to the state authority conferred on the actor, even though the actions are not actually permitted by the authority. Here, however, *the abusive conduct was not in any way related to the duties and powers incidental to the job of ... staff attorney. ... For conduct to relate to state authority, it must bear some similarity to the nature of the powers and duties assigned to the defendants.*

*Id.* at 468 (emphasis supplied). The court held that because defendants' "harassing behavior had nothing to do with, and bore no similarity to, the nature of the staff attorney job," *id.*, they did not act under color of state law. *See also Hughes v. Halifax County School Bd.*, 855 F.2d 183 (4th Cir.1988) (harassment by fellow school district employees was not under color of law because defendants did not purport to act under authority vested in them by state), *cert. denied*, 488 U.S. 1042, 109 S.Ct. 867, 102 L.Ed.2d 991 (1989).

Xiong's argument on appeal is that like the defendant's in *Murphy* and *Hughes*, his acts were outside the scope of his employment and therefore he did not act under color of state law. We disagree.

We cannot say there was *no evidence* to support the jury's view that Xiong acted under color of law. Both plaintiffs in this case came into contact with Xiong because of their need for employment and their understanding that Xiong and his department could be relied upon to supply jobs to Hmong refugees. The jury could have found that each plaintiff was raped during a meeting with Xiong related to the provision of services pursuant to his state employment. An expert in Hmong anthropology testified at trial that after fleeing from Laos, Hmong refugees have been entirely reliant on government aid, and as a result, are in awe of government officials. From this testimony the jury reasonably could have concluded that defendant used his government position to exert influence and physical control over these plaintiffs in order to sexually assault them. *See Parker v. Williams*, 862 F.2d 1471, 1474 (11th Cir. 1989) (jury determined that jailer who kidnapped and raped a prisoner acted under color of law); *Brown v. Miller*, 631 F.2d 408, 410–411 (5th Cir.1980) (mayor acted under color of state law when he attempted to recover a personal debt the city's police chief owed him by diverting his paychecks and forging endorsements).

Because the evidence was sufficient to lead the jury to conclude Xiong acted *in abuse of his state authority*, and to find that he acted under color of state law in raping the plaintiffs, we hold the plaintiffs presented sufficient evidence to establish a § 1983 claim and thus that the jury verdict was not plain error.

### III.

■ Xiong next challenges the trial court's admission of three experts' testimony. We review the decision to admit expert testimony for abuse of discretion. *Taylor v. Burlington Northern Railroad Co.*, 787 F.2d 1309, 1315 (9th Cir.1986). A trial court has broad discretion to admit and exclude expert testimony and its decision will be sustained unless it is "manifestly erroneous." *Id.*

### A: Testimony of Marshall Hurlich

■ Prior to trial, Xiong challenged the testimony of Marshall Hurlich, an epidemiologist with the Seattle Department of Public Health. Hurlich described Hmong culture and explained the behavior of the plaintiffs in this case within that cultural context. The trial court granted Xiong's motion in limine in part and denied it in

part. Hurlich was permitted to testify "generally as to the Hmong culture, but [he was precluded from testifying] as to his opinion regarding the specifics of this case, such as whether there was a rape or why these particular plaintiffs did not report the rape."

At trial, Hurlich explained that Hmong women are generally submissive, and are raised to respect and obey men. He described the role of Hmong women in marriage; their attitudes towards sex, discussion of sex, and extramarital affairs. Most significantly, Hurlich explained that upon fleeing from Laos, Hmong refugees were reliant on government officials for their needs and would not survive in the United States without government assistance. Because of this reliance on government assistance, the Hmong have developed an awe of persons in government positions.

Plaintiffs' counsel attempted to elicit testimony from Hurlich regarding: the likelihood that a Hmong woman would accuse a man of rape; the likelihood that a Hmong woman would travel with a man who was not her husband; and the ability of Hmong women to articulate feelings and memories and to testify in court. The court rejected these questions as violative of the pretrial order.

Xiong argues that Hurlich's testimony should have been excluded because it was not relevant,[1] and because it failed to satisfy the strictures of Fed.R.Evid. 702.[2] Hurlich's testimony was not relevant, in appellant's view, because plaintiffs did not testify they feared Xiong because he was a government official. On the other hand, the testimony was prejudicial because it supported plaintiff's claim that they had trusted and relied on Xiong because he was a government official and thus related to the "color of law" question, and painted unsupported ethnic stereotypes which engendered compassion for the plaintiffs and bolstered their credibility.

Xiong asserts that because the testimony was not relevant, it did not satisfy the requirement of Fed.R.Evid. 702 that expert testimony be necessary to "assist the trier of fact to understand the evidence or to determine a fact in issue...." Xiong relies, however, on authority which taken together stands for the proposition that expert testimony on issues of culture properly is admitted when relevant and not unfairly prejudicial. *See United States v. Doe,* 903 F.2d 16 (D.C.Cir.1990); *United States v. Curnew,* 788 F.2d 1335 (8th Cir.), *cert. denied,* 479 U.S. 950, 107 S.Ct. 438, 93 L.Ed.2d 387 (1986); *United States v. Kills Crow,* 527 F.2d 158 (8th Cir.1975); *United States v. Ruelas–Altamirano,* 463 F.2d 1197 (9th Cir.1972) (per curiam); *State v. Gong,* 115 Idaho 86, 764 P.2d 453 (1988); *People v. Rhines,* 131 Cal.App.3d 498, 182 Cal.Rptr. 478 (1982). These cases do not, as Xiong avers, support the view that courts do not permit the kind of testimony presented by Hurlich. Courts allow the testimony when it is relevant, and preclude it when it is not.

The district court in this case did not abuse its discretion in deciding that Hurlich's testimony, which the court limited to a general explanation of Hmong culture and the role of women in that culture, was relevant. In a hearing that preceded the evidentiary ruling the court said "Hurlich is ... the only expert that either side has located who can explain to the trier of fact who these people are, where they came from, and *why they have responded the way they have in these various functions and various relationships.*" The testimony was relevant to assist the trier of fact to understand certain behavior of the parties here that might otherwise be confusing,[3]

1. Fed.R.Evid. 401 defines relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

2. Rule 702 states: "If ... specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion or otherwise."

3. For example, plaintiffs continued to have contact with Xiong after he raped them. Hurlich's testimony regarding the place of Hmong women in that culture was helpful in understanding plaintiffs' actions after Xiong's attacks.

and to explain the cause, effect and nature of long term Hmong reliance on governmental agencies for support. The testimony was prejudicial to Xiong because it supported plaintiffs assertions that he raped them. It was not, however, *unduly prejudicial* because of its limited scope and its direct relevance to the issues in the case.

■ Appellant also argues that the Hurlich testimony should have been excluded because it failed to satisfy the requirements of *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923), that when expert testimony relies on a specific scientific theory or view, that theory must be generally accepted in the scientific community to be admissible. This argument is inapposite because Hurlich's testimony derived from his expertise as an anthropologist and his study of the Hmong, rather than on a novel scientific theory.

### B. Testimony of Bonnie Baker and Lou Matheson

■ Xiong's pre-trial motion also attempted to exclude the expert testimony of Bonnie Baker, a social psychologist and clinical social worker who interviewed both plaintiffs for the purpose of diagnosis. In its Order re Motion in Limine the district court stated Baker

> may not testify as to her opinion of plaintiffs' credibility regarding the rape charge. Nor may she testify as to any tests which she conducted to evaluate their credibility. The witness may testify as a damage witness as to plaintiffs' psychological condition and her opinion, to the extent that said opinion is based upon plaintiffs' statements that they were raped.

Baker testified at trial as to what each plaintiff explained to her had happened and the resulting problems in each plaintiff's life; her opinions regarding the plaintiffs' psychological conditions; and her general understanding of the reactions of women to various life events, including rape.

Although the pre-trial order apparently did not address the testimony of Lou Matheson, coordinator of the Ethnic Minor-

ity and Mental Health Center, Xiong objected to her testimony at trial and carries that objection into this appeal. The plaintiffs contacted Matheson because of psychological difficulties they experienced after they were raped. The court permitted Matheson to testify as to the experiences each plaintiff described regarding her rape and resulting mental and relationship problems. Matheson also was permitted to testify regarding the mental condition of each plaintiff when she came to the Mental Health Center and the progress each had made in the interim.

Xiong challenges the admissibility of these witnesses, and suggests that whatever relevance they might have had was outweighed by the prejudice to appellant from their recounting appellees' stories to the jury. Xiong argues these witnesses impermissibly served to buttress appellees' credibility in a trial that revolved around questions of credibility. Xiong challenges the testimony of these witnesses on the basis that it failed to satisfy the test set out in *Frye* for novel scientific testimony.

Xiong relies on criminal cases in which experts either were excluded due to lack of assistance to the trier of fact, *see United States v. Barnard*, 490 F.2d 907, 912–913 (9th Cir.1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974), or in which convictions were overturned due to prejudicial admission of expert testimony. In *United States v. Binder*, 769 F.2d 595 (9th Cir.1985), the trial court permitted experts to testify that the victims in this child molestation prosecution "were able to distinguish reality from fantasy and truth from falsehood. The effect of the expert witnesses' testimony was to bolster the children's story and to usurp the jury's factfinding function." *Id.* at 602. The court reversed the conviction because, it found, "[t]he jury in effect was being asked to accept an expert's determination that these particular witnesses were truthful." *Id.* For his *Frye* argument Xiong cites two cases in which courts have rejected expert testimony because of the lack of evidence that the theory upon which the

testimony was based is generally accepted in the scientific community.[4]

The testimony of Baker and Matheson was not irrelevant, nor sufficiently prejudicial to amount to an abuse of discretion. No one asserted that these experts were unqualified in the mental health field or that they had not had sufficient contact with the appellees to comment on their condition. Each expert's testimony assisted the trier of fact in assessing damages. Moreover, although each witness was permitted to recount the stories that the women had told them, in order to demonstrate the basis for their opinions, they were not permitted to state that they believed the women were telling the truth. Finally, neither witness based her conclusions on novel scientific theories. There is no evidence that the testimony related to anything other than standard mental health diagnoses.

We have stated: "To show reversible prejudice a party must demonstrate that the allegedly erroneous evidentiary ruling more probably than not was the cause of the result...." *Jauregui v. City of Glendale*, 852 F.2d 1128, 1133 (9th Cir.1988). There was ample evidence for the jury to conclude that Xiong raped the plaintiffs. Even if the evidentiary rulings were in error, there was insufficient prejudice to justify a reversal here.

## IV.  Conclusion

The judgment of the district court is AFFIRMED.

---

**4.** *See United States v. Gillespie*, 852 F.2d 475, 481 (9th Cir.1988) (lack of evidence supporting testimony regarding use of anatomically correct dolls to detect sexual abuse in children); *State v. Black*, 46 Wash.App. 259, 730 P.2d 698 (1987) (no general acceptance of rape trauma syndrome to prove rape occurred), *decision aff'd by* 109 Wash.2d 336, 745 P.2d 12 (1987).